STATE, EX REL. WILLIAM T. THOMPSON, ATTORNEY GENERAL, RELATOR, V. JOHN J. DONAHUE, CHIEF OF POLICE OF THE CITY OF OMAHA, RESPONDENT.

FILED APRIL 20, 1912.   No. 16,802.

1. **Reference:** FINDINGS OF REFEREE: REVIEW. When a referee, who has been appointed by the trial court to take evidence and report the findings of fact and conclusions of law, makes his report, the correctness of his findings and conclusions may be challenged by filing exceptions and objections thereto, stating the grounds of such objections. No motion for a new trial is necessary for that purpose.

2. ———: REPORT OF REFEREE: MOTION FOR NEW TRIAL. The statute (code, sec. 316) allows a motion for a new trial to be filed at the term that the report of the referee is "rendered." It must be within three days after the "verdict or decision." This limitation of three days does not apply to the report of a referee.

3. **Quo Warranto:** JURISDICTION OF SUPREME COURT: REMOVAL OF PUBLIC OFFICERS. Section 1a, ch. 71, Comp. St. 1911, provides for the removal of public officers for certain causes, and the proper procedure under this statute is by *quo warranto*. This court has original jurisdiction of *quo warranto* by section 2, art. VI of the constitution.

4. **Pleading:** INDEFINITENESS: REMEDY. If the allegations of an information are indefinite, the remedy is by motion. A general demurrer will not be sustained if the information as a whole charges a wilful neglect of duty within the provisions of the statute.

5. **Officers:** REMOVAL: POLICE OFFICERS. While the statute has more ready application to officers who are elected or appointed for fixed terms, and are not subject to removal under other statutes and upon similar grounds, it must be held to extend to inferior police officers in a proper case, since they are expressly included.

6. ————: ————: EVIDENCE. Prosecutions under this statute are highly penal in their nature, and the evidence must be clear and satisfactory. To wilfully fail, neglect or refuse to enforce a law involves more than oversight or carelessness or voluntary neglect. It must be prompted by some evil intent, or legal malice, or at least be without sufficient grounds to believe that he is performing his duty.

7. **Municipal Corporations:** ENFORCEMENT OF LAWS: CHIEF OF POLICE. The enforcement of the law in cities of the metropolitan class is placed by the legislature directly under the control of the board of fire and police commissioners, of which the mayor is principal officer. The chief of police is appointed by the board and removable at its pleasure. It is the duty of the mayor to "order, direct and enforce" the law. If the board directs in what manner and to what extent the law for the suppression of prostitution and the sale of intoxicating liquors shall be enforced, and the chief of police in good faith believes it is his duty to be governed by the established policy of the board and the directions of the mayor, and faithfully enforces the law accordingly, it cannot be found that he did "*wilfully* fail, neglect or refuse to enforce any law *which it is made his duty to enforce.*"

ORIGINAL application in *quo warranto* to oust respondent from the office of chief of police of the city of Omaha. *Dismissed.*

*Grant G. Martin, Attorney General, George W. Ayres* and *Arthur F. Mullen,* for relator.

*W. J. Connell, contra.*

SEDGWICK, J.

These proceedings were begun in this court by the attorney general, upon the direction of the governor, under the provisions of sections 1*a*, 1*b*, ch. 71, Comp. St. 1911, commonly called the "Sackett Law." The respondent is chief of police of the city of Omaha. The action was be-

gun in August, 1910. A referee was appointed to take the evidence and report his findings of fact and conclusions of law. The evidence taken before the referee is contained in nine large volumes of nearly 500 pages each. The questions presented are of more than usual importance. It being the first attempt to enforce the act under which it is brought, able counsel on both sides have given unusual attention to the case and have ably and carefully presented the numerous questions involved. The case has been greatly delayed, perhaps necessarily so under the circumstances, although ordinarily a case of this nature and importance should be promptly heard and determined. The counsel and the referee are to be commended for the thorough work which has been done. The referee made quite comprehensive findings of fact and conclusions of law, reporting that some of the charges against the respondent were not sustained by the evidence and that others were, and that the allegations of the information were sufficiently proved and that the prayer ought to be granted and the respondent removed from his office.

1. After the referee had filed his report, the respondent not having filed any motion for a new trial, the relator moved for judgment upon the report. It is now earnestly contended that a motion for a new trial is indispensable to entitle the respondent to any review of the proceedings by this court and that the motion for judgment ought to be sustained. This argument is derived principally from the provisions of sections 316 and 317 of the code. In *Aultman, Miller & Co. v. Leahey*, 24 Neb. 286, the case was tried to a jury in the district court and was brought to this court upon a petition in error. The motion for a new trial in the district court was filed on the fourth day after the verdict was rendered, and it was held that the motion was filed too late. The opinion contained what purports to be a quotation of section 316 of the code. The quotation, however, is inaccurate. Section 316 is as follows: "The application for a new trial must be made at the term the verdict, report, or decision is rendered,

and, except for the cause of newly discovered evidence material for the party applying, which he could not with reasonable diligence have discovered and produced at the trial, shall be within three days after the verdict or decision was rendered, unless unavoidably prevented." It does not appear from the opinion that the decision in the case was rendered by the district court more than three days before the motion for a new trial was filed, and the court manifestly construed the section to mean that the motion must be filed within three days after the verdict, whether any final decision had been rendered in the case or not. If this is a necessary construction of the statute, the construction ought not to be extended to the report of a referee. The language of the section forbids such a construction. The application for a new trial in the district court must be made at the term that the report of the referee is filed and within "three days after the verdict or decision was rendered." There is a substantial reason for omitting the report of the referee in this clause of the statute, as it would be impracticable in many cases to comply with it, if the motion was required to be filed within three days after the report was rendered. In this case the record shows that the respondent had no notice of an unfavorable report of the referee until more than three days after the report had been filed, and if the report of a referee had been included in the three days' limitation it would in many cases practically prohibit a review in this court of the judgment of the lower court in cases that come here by appeal. This contention of the relator, then, is without merit. The respondent filed exceptions to the report of the referee, and this appears to be the proper procedure to present to the court in which the reference is had the matters relied upon to avoid the findings and conclusions of the referee. In such cases the motion for a new trial is addressed to the trial court and calls the attention of the trial court to the supposed errors in the proceedings and judgment. In law cases such motion is necessary in order to obtain a review in the appellate court.

2. A motion was filed by the respondent which was treated by the counsel and the court as a general demurrer to the information. This motion was overruled, and the respondent now contends that this ruling was wrong and that the information fails to state any cause of action against the respondent. In this connection it is urged that this court has no jurisdiction to enforce this statute. We are, however, satisfied that this court has jurisdiction. The constitution prescribes the original jurisdiction of this court. Section 2, art. VI of the constitution, provides that this court shall have "such appellate jurisdiction as may be provided by law." Its duties as a court of review may be enlarged, but it has been frequently held that the legislature cannot increase its original jurisdiction. The statute under which the proceedings are brought directs that the proceedings shall be begun in this court by the attorney general when directed by the governor. This provision would no doubt be ineffective unless the character of the proceedings was such that this court would have original jurisdiction thereof under the provisions of the constitution. The first section of the act provides that under certain circumstances officers shall forfeit their office and be removed therefrom. There can be no doubt of the validity of this provision, at least when applied to offices created by the legislature; and when an officer has forfeited his office and is subject to removal therefrom, there can be no doubt that *quo warranto* is the correct remedy, and this court is given original jurisdiction in all cases of *quo warranto* by the section of the constitution above cited. Whether the provision of the second section of the statute would in any way limit the jurisdiction of the district courts in such cases, it is not necessary now to determine.

The next contention upon the motion was that the information does not charge any acts or omissions on the part of the respondent that would forfeit his right to the office under the provisions of the statute. The informa-

tion is too long to copy in full. It alleges specific instances of wilful refusal on the part of respondent to make arrests for crimes when required by the mayor and board of fire and police commissioners to do so. Many of the allegations of the information are quite indefinite. No motion was made to require a more exact statement in any of the matters alleged. We will not discuss now this objection to the information. It is sufficient to say that, under our view of the law, the information was not subject to a general demurrer.

3. Many reasons are urged for the conclusion that this prosecution cannot be sustained. It is said that the act was never intended to apply to officers who are appointed by local authorities and who hold their offices at the will of the appointing power, if the duties of their office are neglected. It may be conceded that many substantial considerations are urged for such a construction of the statute. A discussion of other points in controversy will lead to a further consideration of this matter. The occasion for the statute is much more manifest in the case of officers who are elected or appointed for fixed terms and not subject to removal under other provisions of the statute upon similar grounds and for similar reasons as are contemplated in the statute in question, and yet the language of the first section of the act is so broad and general as to compel the construction that it must, in some instances at least, apply to inferior officers removable by the local authorities from which they receive their appointments. The section specifically names police officers and police commissioners, with the general words "or other officers," and these officers cannot in all cases be exempt from its provisions.

4. The next contention is that the evidence does not show that this respondent did "wilfully fail, neglect or refuse to enforce any law which it is made his duty to enforce." Notwithstanding the large amount of evidence taken by both parties, it appears that the evidence as to the principal facts upon which the determination of this

case depends is not substantially conflicting. The contention of the state is that the respondent has failed in many respects; that he has failed to enforce the liquor laws of the state and has neglected and refused to arrest and prosecute known violations of this law; that he has also failed to enforce the law against gambling; and that he has failed and refused to enforce the laws of the state and the ordinances of the city of Omaha, and the orders of the board of fire and police commissioners for the suppression of prostitution. The evidence abundantly shows that in all these respects the law has been openly, notoriously and continuously violated in the city of Omaha. According to this evidence there is and has been for more than 30 years continuously a large district embracing several blocks upon some of the principal streets in that city notoriously known as the "red-light district," in which prostitution and the illegal sale of intoxicating liquors, and in many cases gambling and other vices, have been and are so openly and brazenly practiced that all citizens of Omaha, and all citizens of the state, whose attention may have been called to the matter must be aware of existing conditions. Members of the police force have patrolled this district. At least two of these officers are continually in service there. They have seen these flagrant violations of the law from day to day for many years. They no doubt have the most direct and certain knowledge of the facts, but that knowledge extends beyond them to the police captain and to the chief of police, the board of fire and police commissioners, the city council, the state legislature, and the people of the state at large. All have sufficient knowledge to be responsible for existing conditions.

The governor and the attorney general, assisted by a number of public spirited citizens, have attempted, and without doubt in good faith, to use this new statute to compel a better enforcement of the law.

Are the provisions of the statute applicable to the case made against the respondent? Did he at the times and in

the manner specified "wilfully fail, neglect or refuse to enforce any law which it is made his duty to enforce"? The statute governing cities of the metropolitan class gives the mayor and city council ample power to make and enforce regulations for the "good government, general welfare, health; safety and security of the city and the citizens thereof." Comp. St., ch. 12a, sec. 144, subd. 25. The board of fire and police commissioners consists of the mayor, who is *ex officio* chairman of the board, and four electors of the city, and the mayor and council are by the statute given authority to remove the members of the board for misconduct in office or failure to discharge their duties. Section 60. The board of fire and police commissioners have power to appoint the chief of police and other police officers, and to remove the same "whenever said board shall consider and declare such removal necessary for the proper management or discipline, or for the more effective working or service of the police department" (sec. 62); and it is made the duty of the board "to adopt such rules and regulations for the guidance of the officers and men of said department, for the appointment, promotion, removal, trial or discipline of said officers, men and matrons, as said board shall consider proper and necessary" (sec. 63). Section 64 provides: "It shall be the duty of the mayor to enforce the laws of the state and the ordinances of the city, to order, direct and enforce, through the officers of the police department, the arrest and prosecution of persons violating such laws and ordinances, to co-operate with and assist the sheriff of the county in suppressing riots and mobs, and the arrest and prosecution of persons charged with crimes and misdemeanors." The statute also provides that the chief of police shall be subject to the orders of the mayor and board of fire and police commissioners, and that "all orders of the board relating to the direction of the police force shall be given through the chief of police" (sec. 67).

To our minds the most important question presented in this case is: Under the provisions of the statute, what

shall be regarded as a wilful failure to enforce the law? The next most important question, and one which it is necessary to consider, in order to determine the question already stated, is: What laws is it made the duty of the chief of police, upon his own initiative, to enforce? The decision of this court in *Minkler v. State,* 14 Neb. 181, is cited by the relator as determining what should be regarded as wilful refusal to enforce the law. In that case the county surveyor of Otoe county was removed from office "for wilful maladministration in his office." It appears that in his capacity of county surveyor, and while acting as such, he " 'removed, and carried away all the government landmarks and the stones set up to mark the section, half-section, and quarter-section corners' of certain sections of land." The court said: "The removal of established monuments and landmarks was unlawful and forbidden even from the time of Moses, the great lawgiver." And it was shown that he "knew the true character of the corner stones." The court quotes from the case of *State v. Preston,* 34 Wis. 675. In that case the defendant was prosecuted for obstructing the highway. He offered to prove that the supervisor of the town had determined that there was no highway at the place in question, and instructed him to place the fence where he did. This the court held to be a good defense. This court distinguished that case from *Minkler v. State,* and, no doubt, properly so. Minkler acted upon his own authority. It is impossible to believe that he did not know the nature of government landmarks, and did not act wilfully in removing all of them from several sections of land. In an action to remove a county treasurer for wilful misconduct or maladministration in office, the supreme court of Iowa, in defining wilful misconduct, used this language: "What is the meaning of 'wilful misconduct' as that phrase is here employed? Manifestly it is not applicable to every case of misconduct, nor to every mistake, or every departure from the strict letter of the law defining the officer's duties, but only to wilful wrongs or

omissions on his part. The word 'wilful,' like most other words in our language, is of somewhat varied signification according to its context and the nature of the subject under discussion or treatment. Frequently it is used as nearly or quite synonymous with 'voluntary' or 'intentional,' and evidently this is the interpretation given it by the trial court in the case before us. But when employed in statutes, especially in statutes of a penal character, it is held with but few exceptions to imply an evil or corrupt motive or intent." *State v. Meek*, 148 Ia. 671. And, in an earlier case, the same court said: "Every voluntary act of a human being is intentional, but, generally speaking, a voluntary act becomes wilful in law only when it involves some degree of conscious wrong or evil purpose upon the part of the actor, or at least an inexcusable carelessness or recklessness on his part, whether the act be right or wrong." *State v. Willing*, 129 Ia. 72. Prosecutions to remove officers are penal in their nature, and, while it is generally held not to be necessary that the charges should be proved beyond reasonable doubt, still it is universally considered that the evidence supporting the charges must be clear and satisfactory. The respondent has been connected with the police force for nearly 20 years, and appears, during all that time, to to have been in good standing with his superiors. If he continues in the office he will soon be entitled to a substantial pension for the remainder of his life. If he is found guilty in these proceedings he will be deprived of pension, and his character and efficiency as an officer placed in doubt. An action of this nature is highly penal, and to justify a conviction the charges should be clearly and substantially proved. Under such circumstances, wilful neglect to perform an official duty is considered to be something more than oversight or carelessness or a merely voluntary neglect. It must be prompted by some evil intent, or legal malice, or without sufficient ground for believing himself justified in the course pursued. *State v. Preston*, 34 Wis. 675, and cases cited; *Felton v. United*

*States*, 96 U. S. 699. This construction has been adopted by this court: "But where such act results from a mere error of judgment or omission of duty without the element of fraud, or where the alleged negligence is attributable to a misconception of duty rather than a wilful disregard thereof, it is not impeachable, although it may be highly prejudicial to the interests of the state." *State v. Hastings*, 37 Neb. 96.

We have said that the citizens of the state and the state itself, in its governmental capacity, are not entirely free from responsibility for the conditions which are complained of as existing in the city of Omaha. There has been some difference of opinion expressed by the courts as to the conditions which will justify the state in interfering with the affairs of local municipal government, but there have been no differences of opinion upon the proposition that the state has the jurisdiction and the duty to see that its laws for the government and protection of its citizens are observed and enforced in all parts of the state. If the local authorities are unwilling or unable to enforce these laws the state may intercede and directly control the police power necessary to their enforcement. The enforcement of the law in cities of this class is now placed by the legislature directly under the control of the board of fire and police commissioners, of which the mayor is the principal officer. If this board is selected by the voters of the city it will presumably, so far as it is able, compel such enforcement of the law as the majority of its constitutents desire and command. If the laws of the state are disregarded in any locality because of the perversity of public sentiment, and the state is compelled to interpose for their enforcement, and to that end selects the immediate governing power of the instrumentalities of its enforcement, they will presumably enforce the law as the enlightened intelligence of the people of the state at large demand.

In 1897 a law was enacted by the legislature which provided that the board of fire and police commissioners of

24

cities of the metropolitan class should be appointed by
the governor of the state. This statute was held by this
court to be constitutional. *Redell v. Moores,* 63 Neb. 219.
Such appointments were made accordingly. Afterwards
this statute was repealed, and the selection of these offi-
cers was again confided to the voters of the muncipality.
In this case the evidence shows without conflict that there
was a difference of opinion among the members of the
board of fire and police commissioners. Mr. Karbach, one
of the members, insisted that the laws, the violation of
which is now complained of, were not adequately en-
forced. The mayor and the other members of the board
appear to have disagreed with him, and they, apparently
without his assistance, determined upon and adopted
the policy of the board with regard to the enforcement of
these laws. The difference of opinion in the board in re-
gard to the suppression of these violations of the law
was as to the degree that the violations should be tolerated.
Mr. Karbach did not insist that these violations of the
law could be wholly suppressed. He was called as a wit-
ness and testified: "I thought that a limited number of
them (houses of prostitution) in the prescribed district
was a necessary evil. As a member of the fire and police
commission I was in favor of a limited number of houses
of prostitution in the 'red-light district.' " Mr. Karbach
testified that he introduced a resolution before the board
of fire and police commissioners, the substance of which
was: "The chief of police 'is hereby instructed to arrest
and prosecute all parties selling liquor illegally,' " and
that the resolution did not receive a second. He further
testified: "The board, I think, practically, with the ex-
ception of Mr. Paige, agreed to allow those houses to
open again on condition that they put curtains on all of
the doors and windows, and stop soliciting of any kind.
* * * I offered a resolution, looking toward a more strict
enforcement of laws and ordinances. This resolution re-
ceived no second, and didn't go into the minutes. In Oc-
tober I offered another resolution. instructing the chief

to stop the illegal sale of liquor.   There was no second to
this motion.   *   *   *   My feeling of animosity toward the
chief is not as strong as it is toward the other members
of the board."   They all appear to have considered that
an attempt to wholly suppress or separate the social evil
and the sale of liquor to be unsuccessful, they having
been associated together in Omaha for more than 30 years.
Two detectives were employed to investigate existing con-
ditions as to the violation of the liquor law.   They made
quite an extensive report of existing conditions, and of
the attempt that had been made to enforce the law, and
the results.   This report was submitted by the respondent
to the board of fire and police commissioners and was
discussed and acted upon by them.   It appears that the
entire board of fire and police commissioners considered
these houses a necessary evil, and that the proper enforce-
ment of the law did not require their suppression.   Even
the member who thought that the prosecutions were in-
sufficient entertained this view.   In this the board must
have been supported by a majority of the voters of the
city of Omaha.   This policy was the foundation of all of
the violations of law complained of.   The evidence shows
that all other violations of the law, such as are complained
of, were practiced freely in these houses, and could not
be suppressed if these houses were allowed to continue.
It may be that the chief of police and every member of the
police force were mistaken in supposing that they ought
to be controlled by this policy of enforcing the law, but
we cannot believe that they were guilty of a wilful re-
fusal to do their duty because of this mistaken notion
that they should be governed by the policy of their su-
periors.

It appears that the governor, after making some in-
vestigation, wrote to the respondent specifying in detail
instances of the violation of the law.   After the respond-
ent received this letter he prepared an answer manifestly
in accordance with what he thought were his instructions
from the mayor and board of fire and police commis-

sioners. He then submitted the governor's letter and his proposed reply to his superiors, the mayor and board of fire and police commissioners. He concludes his letter to the governor with the following expression: "If you have any further suggestions or recommendations, I shall be pleased to have them, and I will, as above stated, take the matter up with the mayor and board and act upon their instructions." This is the key to the whole conduct of his office. The evidence shows that he is an intelligent and efficient officer. He knew, beyond doubt, the policy of his superiors, the mayor and the board of fire and police commissioners, and, being subject to removal by them at any moment, he seems to have believed that it was his duty to enforce the law against these houses of prostitution and unlawful sale of liquors in the manner and to the extent that they indicated. In this he seems to have succeeded as well as ought fairly to be demanded of him, and this is what he had in mind when he testified: "My understanding was, what I meant to say, was that we were enforcing the law, and had been, and would continue to the best of our ability. I didn't say that I was handicapped by anybody interfering with me." When he was asked whether there was any understanding with the members of the board of fire and police commissioners that the laws were not to be enforced with reference to the unlawful sale of liquor, he answered that there was no such understanding. The board had determined upon many restrictions upon the conduct of the inmates of these houses and upon the sale of liquors. They evidently considered that enforcing the law, and to some extent it was, and the respondent to that extent enforced the law acting under the policy and instructions of his superiors.

It was made the duty of the chief of police to keep the city attorney and prosecuting officers of the county informed of all matters that pertained to their several offices relating to the police interests of the city and of any breach of the law or ordinances. This appears from the

evidence to have been done, and prosecutions were commenced whenever so advised by the proper officers. Search warrants were issued and liquors seized. Many trials were had, and, in a few, convictions were obtained, but as a rule the prosecutions appear to have been unsuccessful. The city attorney testified that during the year 1910 there were seven or eight prosecutions for running houses for the purposes of prostitution, and about 75 or 100 prosecutions for keeping disorderly houses, and said: "I construe the 8 o'clock closing law to apply to saloon-keepers only. * * * I know of no case where the chief of police or the detectives failed, refused and neglected to aid and assist me in obtaining witnesses and bringing about a successful prosecution."

The board of fire and police commissioners adopted their policy with regard to these violations of the law complained of upon full information. The members of the police force, who continually patrolled the worst portions of the city, as well as those whose duties were in other localities, reported the conditions which they found, and these reports were before the board in its official capacity, as well as before the members of the board. The respondent kept his under officers informed as to the resolutions of the board regarding the manner of enforcing the law. In some of his communications to the captains of police we find the following language: "As you will see by a resolution passed by the Honorable Board of Fire and Police Commissioners, at its meeting last night, they further request the enforcement of the order of March 2d, in regard to closing of all cribs fronting on the streets, alleys or lanes within the 'District.' I wish to have you notify all the owners and occupants of said buildings where cribs have existed, and where they have made additional improvements, that they must cease operations at once, and any woman occupying a crib, or the places designated in the former resolution, will be arrested and brought into court after the notification given this day. You will also notify all landlords and women having name

plates on their doors that they must remove the same at once, and also all houses with glaring lights, showing names and numbers, must be removed, and they must confine themselves to an ordinary light, such as an incandescent electric light. In other words, all these glaring lights must be taken down, and, if they show a light at all, it must be of a small calibre. I wish to have this resolution of the board strictly enforced, beginning after the first notification for them to vacate."

The relator in his brief says: "In the nature of things, the entire surroundings of the respondent must be taken into consideration in passing on his good faith as an official. It would be unfair to separate and take a part of the duties or actions of the chief of police during the year 1910 and base a finding absolutely on one part of his administration. * * * The board of fire and police commissioners have the right and can remove the respondent without cause; they could remove him for a cause. * * * The house of prostitution is the pillar on which the whole system rests. If the police force would prosecute the keepers of the houses, public prostitution could not exist."

The respondent testified: "We have done everything we could. Have never purposely or wilfully neglected to carry out the directions of the board or to do what I could to suppress lawlessness and crime. We have done what we could to suppress lawlessness and crime of the character referred to in the complaint. I mean that we have carried out the orders of the board. I have been ready and willing to act upon information furnished from any source and that was sufficient, according to the requirements of the prosecuting officer, to secure complaint. We made investigations and submitted what we found to the county attorney's office and to the city prosecutor with reference to the surreptitious sale, referred to in my letter, to the extent that I had knowledge of them. We made investigations with reference to the maintaining of houses of prostitution and the selling of liquor without license.

We have a section in the city known as the 'red-light district.' I presume it has existed for over 30 years in the northeast part of the town. It is a part of the Third ward. * * * In my judgment I would not have any right whatever to arrest any person without a warrant, except I found them in the commission of a crime. * * * As I recollect it, the ordinance directing the chief of police to suppress prostitution was repealed years ago, and· it was taken away from him, giving him no jurisdiction whatever over it. I think the mayor has jurisdiction over the city to enforce the law. The chief of police acts under his direction. My construction of the law is that it is my duty to carry out the orders of the mayor. * * * All my conduct as chief of the police, with reference to the suppression of houses for selling liquor without license, was guided by the rules of the fire and police commission, laws of the city, and laws of the state. * * * I don't believe I remember of any resolution referring to this. I think the board took my letter and the governor's letter and went over them and said it was all right, my answer was all right, met with their approval, as I recollect it, no resolutions were passed."

Our statute provides: "Every sheriff, deputy sheriff, constable, marshal, or deputy marshal, watchman, or police officer shall arrest and detain any person found violating any law of this state, or any legal ordinance of any city or incorporated village, until a legal warrant can be obtained." Criminal code, sec. 283. This section, no doubt, applies to the chief of police of Omaha. It was, then, his duty to arrest at once any one he personally found violating the law. He was under the control of the mayor and board of fire and police commissioners, as a deputy sheriff or deputy marshal is under control of his chief. If a deputy sheriff is informed, and has ample reason to believe, that the law is being violated in a certain building, and informs the sheriff of that fact, and proposes to make an investigation and see personally whether the law is being violated, and is told by the

sheriff, his superior officer, not to do so, but to give no more attention to the matter, it may be insisted that the deputy should disregard instructions of his chief and should ascertain whether the law is being violated, and, if he found that it was, make arrests and take his chances of summary removal by his chief; but it must be conceded that the deputy, under such circumstances, might reasonably have doubts in regard to his duty, and that, if he complied with the known policy and authority of his chief, he could not be convicted of wilfully refusing to enforce the law if he failed to make further investigation. This seems to be very nearly the position in which the respondent was placed. He was appointed by the mayor and police board. He was removable by them at their pleasure. They had all of the information in regard to existing conditions that the respondent had. He knew what had been determined by his superiors to be a sufficient and proper enforcement of the law. He knew that if he violated their policy they might be expected to immediately remove him in favor of one who would obey instructions. He had not personally seen the violations of the law complained of. He knew of them by the reports of the police force, as his superiors, the mayor and board of fire and police commissioners, knew of them. The statute (sec. 64) makes it the duty of the mayor to "order, direct and enforce" the laws "through the officers of the police department." It is not so clear that the mayor could not "direct" the manner and extent of the enforcement of law against these evils, which had been long tolerated by public sentiment and high officials, as to render an under officer guilty of wilful neglect in following those directions if he acted in good faith, believing that he was doing his duty. If he in good faith believed that it was his duty to take such action in regard to the enforcement of the law as the mayor and board of fire and police commissioners prescribed for him he may have been mistaken, but it does not clearly appear that he acted wilfully.

State v. Donahue.

The complaint against respondent, therefore, is not sustained, and is

DISMISSED.

REESE, C. J., concurring in the conclusion.

It may be that the conclusion arrived at in the foregoing opinion is the only one which can be justified under the facts, but I cannot agree to all that is said. From the facts detailed, it may fairly be assumed that the mayor should have been included in the order of the governor to the attorney general. It is a part of the public history of Omaha that the officers have been inexcusably derelict in the discharge of the duties imposed upon them by law, their oaths, and the necessity for the protection of property and law-abiding citizens. It must be conceded that the chief of police is in some respect subject to the control of the mayor and police board, but, as pointed out in the opinion, the fact that those officers failed and refused to discharge their sworn duty, and might have removed respondent for no other cause than that he did discharge his, ought not to furnish any justification for his failure. He knew that the law was being violated within the city by day and by night continuously. True, he perhaps did not *see* those violations, but his officers reported them to him, and the *law* said it was his duty to enforce its observance. That law was of higher authority than the direction of the mayor or police board. The obligation of his oath of office could not be diminished by their directions or commands. He failed to do his duty. But, if he, acting in good faith, understood and believed that the mayor, whom the statute provides shall direct him in the discharge of his duties, had the right in connection with the police commissioners to control his actions, notwithstanding the mandatory provisions of the statute, it *may* be that it ought not to be held that he had "wilfully failed or refused to enforce any law which it is his duty as such officer to enforce." Questions of this kind must be solved

by a consideration of the facts in each particular case. If the mayor and police board, admittedly the superiors of the chief of police, knowingly and wilfully stand in the way of the enforcement of the law by their subordinate officers, it seems clear that they should not escape, and the whole of the penalties of the law inflicted upon their subordinates. Neither the attorney general nor the court are accountable for these discriminations.

ROSE, J., dissenting.

In my view of this case, the majority in their opinion have departed from three fundamental principles which seem to me to be essential to the welfare of society: (1) In a proceeding to remove a police officer for wilful failure to enforce the law, he should not be allowed to retain his office by showing that he obeyed the lawless directions of his superior officers, though in doing so he permitted open and notorious lawlessness and violated the solemn enactments of the legislature and the instructions of the governor whose duty it is as chief executive to see that the laws are faithfully executed. (2) The word "wilfully," in a statute providing for the removal of a police officer "who shall wilfully fail, neglect or refuse to enforce any law which it is made his duty to enforce," has a meaning different from the definition of that word as used in the criminal law to describe a felonious act, and does not mean that the conduct of the officer, to justify his removal, "must be prompted by some evil intent, or legal malice, or at least be without sufficient grounds to believe that he is performing his duty." (3) A statute establishing a new method of removing a public officer for wilful failure to enforce the law is remedial legislation and should be liberally construed with a view to suppressing the mischief which made the legislation necessary; and a construction which would weaken the effect of the statute should be avoided.

1. For the purpose of enforcing obedience to law in every part of the state, of extending to the people gen-

erally the protection of the governor as chief executive and of making effective that provision of the constitution declaring that "the supreme executive power shall be vested in the governor, who shall take care that the laws be faithfully executed," the legislature recently passed an act containing these words: "Any county attorney or prosecuting officer, sheriff, police judge, mayor, police officer, or police commissioner or other officer who shall wilfully fail, neglect or refuse to enforce any law which it is made his duty to enforce shall thereby forfeit his office and may be removed therefrom." Comp. St. 1911, ch. 71, sec. 1a.

Other provisions of the act authorize the governor to direct the attorney general to institute proceedings to remove any police officer who wilfully fails, neglects or refuses to enforce any law which it is made his duty to enforce. Under power thus granted, the governor directed the attorney general to bring this suit against respondent as chief of police to remove him from office for neglecting to enforce the laws in the city of Omaha. A statute of this state makes it the duty of a chief of police to "arrest and detain any person found violating any law of this state, or any legal ordinance of any city or incorporated village, until a legal warrant can be obtained." Criminal code, sec. 283. Under the charter of the city of Omaha, additional power is conferred upon the chief of police in the following lanuage:

"He shall have, in the discharge of his proper duties, like powers, and be subject to like responsibilities, as sheriffs in similar cases.

"Each policeman shall give a bond conditioned as provided in this act, and shall have the same powers as constables in arresting all offenders against the laws of the state, and may arrest all offenders against the ordinances of the city with or without a warrant. In discharge of their duties as policemen they shall be subject to the immediate orders of the chief of police." Comp. St. 1911, ch. 12a, secs. 70, 71.

Referring to the laws forbidding gambling, prostitution and illegal sales of intoxicating liquors, the majority find: "The evidence abundantly shows that in all these respects the law has been openly, notoriously and continuously violated in the city of Omaha. According to this evidence there is and has been for more than 30 years continuously a large district embracing several blocks upon some of the principal streets in that city notoriously known as the 'red-light district,' in which prostitution and the illegal sale of intoxicating liquors, and in many cases gambling and other vices, have been and are so openly and brazenly practiced that all citizens of Omaha, and all citizens of the state, whose attention may have been called to the matter must be aware of existing conditions."

The conditions thus described have not only been known to respondent, but reports showing the facts are on file in the department of which he is the chief. The machinery and power of the police department of a great city are in his hands. His official connection with the police department extends over many years. It would be an affront to his intelligence to intimate that he is ignorant of the lawlessness proved. That he intentionally refused to enforce the law, knowing the lawless conditions described, is fully established by the evidence. I do not concur in the opinion of the majority that he is not answerable in this action because, in permitting open violation of the law, he is carrying out the policy of the police commissioners and the mayor who appointed him. He is the officer of the city. In the city's connection with the state, he is the state's officer. His obligation, like that of other officers, is to uphold the constitution and laws. Orderly society is entitled to his protection within his jurisdiction. He is not the employee of his superior officers. His power comes from the state and his compensation from the city, and not from his superiors who give protection to crime and vice. As an officer he owes a duty to the public. Only proper and lawful instructions from the mayor and police commissioners are entitled to

State v. Donahue.

his official respect. He has no function except to enforce the law. There was no other purpose in the creation of his office. Every order from his superiors to sanction or permit outlawry is the wrong of those individual persons who for the time being hold the offices. The adoption of a policy to neglect the enforcement of the law is an offense of lawless individuals, and not the authorized act of officers. In criminal procedure it is no defense to a complaint charging a felony that accused committed the crime at the direction of a public officer or of an individual holding a public office. In a civil suit against an officer for dereliction of duty, why should a policy of lawlessness adopted by his superiors be a defense? Neither private citizens nor police officers should find protection in orders to disregard the law. Citizens and officers alike should disobey instructions to ignore valid statutes or ordinances. A police officer, when called to the bar of justice for failing to perform his duties, should not be permitted to make out his defense by showing that he acted under instructions from his superiors to disregard open and notorious lawlessness. The contrary doctrine sanctions a defense established by proof of wrong, neglect of official duty and violation of law. The chief of police has a higher duty than his obligation to the persons who happen to occupy the offices of mayor and police commissioners. The demands of the state and the welfare of society have stronger claims upon his loyalty. His duty to those who should direct his course aright is within the law, and he has no authority to follow them into open lawlessness, where the dividing line is not in doubt.

Like all other officers and individuals, respondent should respect the provisions of the constitution. That instrument declares that the governor of the state "shall take care that the laws be faithfully executed." Const. art. V, sec. 6. This duty extends to every part of the state. When the governor lawfully directs respondent to enforce a particular statute, his orders should not be annulled by a lawless policy adopted by persons tempo-

rarily acting as mayor and police commissioners. The governor called to the attention of respondent specific instances of violations of the law, with a view to the enforcement of its provisions. Respondent's answer was that he would take the matter up with the mayor and the board and act upon their instructions. As a result the unlawful conditions described in the opinion of the majority were allowed to continue in spite of the law, in spite of official oaths to enforce it, and in spite of the demands of the chief executive, whose duty it is "to take care that the laws be faithfully executed." Is the law-enforcement demanded by the governor less binding on a chief of police than the lawless acts of individuals who assume as officers to adopt a policy which sanctions lawlessness and protects lawbreakers? A chief of police may resign any time or he may be removed for any cause specified by statute. The record shows that respondent, after having been warned by the chief executive to enforce the law, wilfully and deliberately participated in carrying out the policy which resulted in the lawless conditions found by the majority to exist, and in my judgment the reasons for dismissing the action are unsound.

2. I cannot agree to the majority's construction that "to wilfully fail, neglect or refuse to enforce a law," as applied to the statutory duty of an officer, "involves more than oversight or carelessness or voluntary neglect," and that "it must be prompted by some evil intent, or legal malice, or at least be without sufficient grounds to believe that he is performing his duty."

There is a vast difference between the meaning of the words "wilful" and "wilfully," as used in criminal statutes, and the same words, as used in statutes imposing duties on public officers and providing punishment for failure to perform those duties. The distinction has generally been made by courts and text-writers. Those words, and other familiar words used in the criminal law to describe criminal acts made punishable at common law, were intended, in some measure, to protect innocent men from the exe-

cution block of bloody rulers or to prevent the punishment of men who had committed no offense. This meaning should not be borrowed from the criminal law of the odious past and inserted by the court in a recent statute imposing upon public officers the duty to enforce legislative enactments. It should not be used to justify a guilty officer in permitting open and notorious lawlessness. The distinction mentioned led the supreme court of Michigan to observe: "The word 'wilfully,' when used to denote the intent with which an act is done, is a word which is susceptible of different significations, depending upon the context in which it is used." *Highway Commissioners v. Ely,* 54 Mich. 173, 180.

In *People v. Herlihy,* 72 N. Y. Supp. 389, the captain of police in command of the Twelfth precinct of New York City was indicted for "wilfully omitting to perform a duty enjoined upon him by law." The conditions in his precinct resemble those in Omaha, as described in the opinion of the majority. In New York the captain was charged by law "with the duty of observing and inspecting houses of ill fame, repressing all unlawful and disorderly conduct and practices therein, enforcing the law and preventing violations thereof." The captain demurred to these facts: "(1) That he was captain of police; (2) that the law enjoined upon him the duty of carefully inspecting all houses of ill fame and houses where common prostitutes resort or reside, to repress and restrain all unlawful or disorderly practices therein, and to enforce and prevent all violations of law; (3) that during a certain period of time, and while he was in command of the Twelfth precinct, there were 109 houses of ill fame therein kept and maintained openly and notoriously; and (4) that he wilfully neglected his duty by permitting such violations of law to continue, and by omitting to take proper and effective means for their repression and prevention." In part, the court in the case last cited said: "Can it be seriously contended that a captain of police is not a public officer, or that he is not

in duty bound to enforce the law, or that the mainte-
nance of a house of ill fame is not a violation of law, or
that if houses of ill fame are notoriously maintained in
his precinct it is not his duty to suppress them, or that
if he wilfully neglects to suppress them he is not guilty
of a neglect of duty, or that for such neglect of duty he is
not amenable to the law? If these propositions can be
successfully maintained, there is an end to the prosecu-
tion, and, indeed, there is an end to all responsibility of
the policeman as a public officer. But such is not the law,
for of necessity to the very existence of organized society
a public officer is bound to a strict performance of and
responsibility for the duties which devolve upon him. It
is a rule of general application that every wilful disobedi-
ence of law enjoining the performance of official duties,
and every wilful neglect of such duties, is a crime, and
neither corruption nor injurious result need be proved as
an essential of the crime. Both the common law and the
statute declare this rule to be the law."

A statute of Kentucky required public service corpora-
tions to report to the state auditor the information neces-
sary for the purposes of taxation, and imposed a penalty
for "wilful failure to make such report." Referring to
the sections containing those provisions, the supreme
court of Kentucky decided: "The word 'wilful,' as used
in those sections, does not mean a deliberate determina-
tion to refuse to make the report for the purpose of de-
frauding the state, or evading or hindering it in the col-
lection of taxes. The term, as used in the statute, simply
means a voluntary act of the defendant as distinguished
from coercion, or, in other words, that he was free to re-
port or not to report." *Louisville & Jeffersonville Ferry
Co. v. Commonwealth*, 104 Ky. 726.

In *People v. Brooks*, 1 Denio (N. Y.) 457, 43 Am. Dec.
704, a justice of the peace was called to account for "wil-
ful neglect of duty" in refusing to comply with a statute
requiring him to take an affidavit. In defining the mean-
ing of the statutory term, the court in that case said:

"The language of the statute is, that the neglect of duty must be 'wilful,' and this neglect was of that character. The justice knew what was asked of him, and he knew what he refused; there was nothing like surprise, inadvertence or misapprehension on his part. He refused to administer the oath, and he intended so to refuse. This was a wilful violation of duty, for 'every intentional act is necessarily a wilful one.' *Commonwealth v. Green,* 1 Ashm. (Pa.) 289."

A statute of Kentucky required every superintendent of schools to settle his accounts before August 1, and provided for his punishment for "wilful failure" to do so. In *Tracy v. Commonwealth,* 76 S. W. (Ky.) 184, it was ruled: "The failure of a superintendent to make his settlement within the time required was a 'wilful failure,' where it was voluntary, notwithstanding his excuse that he failed to do so because certain receipts for moneys paid had been destroyed, and it was his purpose to make the settlement as soon as he could obtain duplicates."

A statute of New York empowered the superintendent of public instruction to remove any school officer who "wilfully" disobeyed his decision. In construing that provision in *People v. Draper,* 63 Hun (N. Y.) 389, the supreme court held: " 'Wilful' in the statute giving the superintendent power of removal was equivalent to 'intentional.' "

The precedents show that the word "wilfully," as used in a statute imposing duties on a public officer and providing penalties for the violation of those duties, does not mean, as stated in the opinion of the majority, "some evil intent, or legal malice, or at least be without sufficient grounds to believe that he is performing his duty."

In *State v. Hastings,* 37 Neb. 96, cited to sustain the opinion of the majority, the court was trying an impeachment for "misdemeanor in office"—a technical term used in the constitution. Its meaning is not the same as the term construed in this case—"wilfully fail, neglect or refuse to enforce any law." The case is not in point.

25

In the opinion of the majority it is said that "the chief of police is appointed by the board and removable at its pleasure." This means that the board may remove him from office without notice or hearing, with all the attending consequences. In *State v. Smith,* 35 Neb. 13, this court said: "Where by law there is no fixed term of office and the incumbent holds during the pleasure of the appointing power, the power of removal is discretionary and may be exercised without notice or hearing."

It is thus established that the board of fire and police commissioners, without notice or hearing, may remove respondent and deprive him of all hope of a pension, if he refuses to follow their policy of permitting open and notorious lawlessness, and I have been unable to follow the course through which the power of removal for wilful failure to enforce the law, when extended to this court, became suddenly of so little consequence to society, and of such magnitude to the individual person who as chief of police knowingly permits open and notorious lawlessness, that it is now "highly penal," requiring, as a condition of its exercise, evidence "clear and satisfactory," though it is declared in a long line of earlier decisions that a mere preponderance of the evidence establishes any issue in a civil case. This court was once of a different opinion. In *State v. Sheldon,* 10 Neb. 452, it is shown that a county treasurer was removable for the statutory ground of "wilful neglect of duty." In the opinion it is said: "The county treasurer, having failed to account for the moneys in his hands properly chargeable against him as treasurer, is guilty of wilful neglect of duty, and may be removed from office; and the fact that the moneys were stolen is no legal justification for the failure to account for them." This is in harmony with the following doctrine announced by Wharton: "A man who undertakes a public office is bound to know the law, and to possess himself diligently of all the facts necessary to enable him in a given case to act prudently and rightly. If he do not, and through mistake of law or of

fact be guilty of negligence, he commits a penal offense. This seems hard law, but it is essential to the safety of the state." 2 Wharton, Criminal Law (10th ed.) sec. 1582.

3. The statute providing for the removal of officers who fail to perform their duty is a remedial statute. Sedgwick in his work on Statutory Construction says: "Remedial acts are those made from time to time to supply defects in the existing law, whether arising from the inevitable imperfection of human legislation, from change of circumstances, from mistake, or any other cause." Sedgwick, Statutory Construction (2 ed.) p. 32. The same author also adopts the following rule of Dwarris: "The words of a remedial statute are to be construed largely and beneficially, so as to suppress the mischief and advance the remedy." Sedgwick, Statutory Construction (2d ed.) p. 309. Both of the foregoing rules were adopted by this court in its early history and were followed until the majority opinion in this case was written. *Buckmaster v. McElroy*, 20 Neb. 557. The statute making additional provisions for the removal of police officers does not deal with a new subject. It was intended as an additional civil remedy. It should be construed to give effect to its provisions with a view to correcting the mischief at which the legislation is directed. The construction of the majority has the opposite effect. It weakens the statute, and in many cases will make it inoperative. In my judgment the dismissal cannot be justified.

LETTON, J., concurs in the dissent.

HAMER, J., dissenting in part and concurring in part.

I am compelled, in part, to dissent from the opinion of the majority touching the question of jurisdiction to hear and determine this case. As this court has assumed jurisdiction, and has heard the case, and has reached a conclusion, I will say that I concur in the result reached, but I do not concur in the reasoning nor in the conclusion, except that I agree to the result. The respondent was

charged in this court in an information in *quo warranto*, as chief of police of the city of Omaha, with wilfully and unlawfully failing, neglecting and refusing to enforce the laws of the state of Nebraska "which it is made his duty to enforce," and the ordinances of the city of Omaha. After this general allegation there is in the complaint the charge that since said Donahue has held his office there have been a large number of persons, principally inmates and keepers of houses of prostitution and assignation, who have unlawfully sold "intoxicating liquors and are now unlawfully selling intoxicating liquors in said city of Omaha without having first procured a license to sell the same; all of which facts were well known to said John J. Donahue." It is then charged that said Donahue "unlawfully and wilfully" failed, neglected and refused to cause the arrest and prosecution of the guilty persons. A large number of places are mentioned in the information where it is alleged intoxicating liquors were unlawfully sold, giving dates of such sales, and the names of the proprietors and occupants of the houses. In this connection it is alleged that the rules of the board of fire and police commissioners for the said city of Omaha for the government of the police force enjoining said duties upon the said Donahue are: "It shall be the duty of the chief of police to see that the laws of the state, the ordinances of the city, and the rules and regulations of the board of fire and police commissioners are duly enforced throughout the department, and he shall keep the city attorney and prosecuting officers of the county informed of all matters that pertain to their several offices relating to the police interests of the city or of any breach of the law or ordinances. * * * He will be diligent in the enforcement of the laws relating to lotteries, lottery policies, and the sale of liquor and gambling of all kinds." It will be noticed that the complaint fails to allege that he neglected to keep the city attorney and prosecuting officers of the county informed of matters pertaining to their offices relating to the police interests of the city or of any breach

of the law or ordinances. It is not alleged specifically, as it would seem that it should be in any sort of criminal case, what particular law he "refused to enforce." It is said that he "neglected and refused to enforce the laws of the state of Nebraska, which it is made his duty to en-' force," but the particular law that he so neglected and refused to enforce is not seemingly set out anywhere. It is only in a general way that any sort of charge is shadowed forth against him. It would seem that he was put on trial "on general principles," and without 'a specific charge, such as is ordinarily made under the rules of the criminal law.

The law under which this proceeding was brought is chapter 78, laws 1907, and reads: "Section 1. Any county attorney or prosecuting officer, sheriff, police judge, mayor, police officer, or police commissioner or other officer who shall wilfully fail, neglect or refuse to enforce any law which it is made his duty to enforce shall thereby forfeit his office and may be removed therefrom. Section 2. The attorney general of the state, when directed by the governor, shall institute and prosecute *quo warranto* proceedings in the supreme court against any such county attorney or prosecuting officer, sheriff, police judge, police officer, or police commissioner, mayor or other officer, and if the court shall find that such officer has wilfully failed or refused to enforce any law which it is his duty as such officer to enforce, then the court shall render judgment of ouster against such officer and the office shall thereby become vacant."

It will be noticed that there is an absence in the charge of any statement telling *how he refused* "to enforce any law." The impossible nature of the thing which the statute seems to contemplate that he may be compelled to perform, provided it is so construed, is seemingly a bar to any proceeding against the respondent. There is no allegation that he refused to communicate what he knew to the county attorney or to the deputy county attorney or the police judge or the mayor concerning any particular vio-

State v. Donahue.

lation of law. All persons who know anything about the matter must realize that it is an impossible. thing for a police officer himself to enforce the law. A police officer does not draw up complaints. A police officer does not examine witnesses nor make speeches before the police judge or before any magistrate or in the district court before the jury in criminal cases. A police officer is just a man to assist his superior officers in maintaining order. He is not a lawyer, neither is he a judge. In the enforcement of .the law it is necessary that these officers participate. The chief of police is simply the arm of the law; he is not the prosecutor. He never was intended as a prosecutor. He is not supposed to have any legal knowledge or any duty to perform beyond that of arresting those who are 'charged with violating the law, or who are seen by him to violate the law. He is not a county attorney or a deputy county ·attorney or a sheriff or a police judge or a magistrate of any kind. It is peculiar in this case .that the executive arm of the mayor and board of fire and police commissioners should be picked upon as the person to be punished, when the people whose real duty it was to maintain prosecutions, if there was a violation of law, were not charged with any sort of dereliction. Why was not a complaint made against the city attorney and the county attorney and the police judge and the justices of the peace and the mayor and the board of fire and police commissioners?

The purpose of the act under which this prosecution is brought would seem to be to thrust upon this court the burden of so disciplining the officers of cities that they will prosecute cases for misdemeanors which would not otherwise be prosecuted. The thing attempted to be done suggests mistrust of the morals of the people in the cities of the state and unwillingness upon the part of the legislature to trust the officers of our cities elected by the people with the administration of their own affairs and the punishment of their offenders. The thing sought to be done is not in accord with the love of self-government in city

communities or elsewhere. Communities desire to govern themselves, and if they can do so by a judge and jury of their own or by a board of their own they will be better satisfied. No community likes to be governed by some other community. No man wants to be tried by a foreign tribunal, however innocent he may be. The reason is that the foreign tribunal may not possibly know the things which are of advantage to the defendant. *Olive v. State,* 11 Neb. 1. If the case brought against Donahue could be tried before a Douglas county judge and jury or a Douglas county body of men of the average standard of morality, Donahue would have no cause of complaint. But if Donahue can be tried by one man belonging to one particular type, and not by a body of men, and this type of man, however unobjectionable in his private life and however upright, may bring in a finding as referee that shall be adopted instead of adopting the view of a judge and jury or of a board belonging to Douglas county, then Donahue is likely to be in most imminent danger. The man selected as referee is only *one* man, and, however upright he may be, there is danger that he will be influenced by special conditions that surround him or by particular individuals, and that his finding will not be as fair and as unbiased as the finding of a jury or board composed of a number of men. This method of trial would seem to be clearly objectionable if there is any other method of trial that has been provided under the constitution and the law. This man is practically on trial for an alleged criminal offense before a referee. He has been deprived of a trial by a judge and jury of Douglas county. He has been deprived of a trial by the mayor and board of fire and police commissioners who appointed him. He has been tried by a referee, when the thing brought against him is more serious and of greater magnitude to him than if he might be sent to the penitentiary. This trial, to the writer, violates every sense of propriety.

Section 58, ch. 12*a*, Comp. St. 1909, provides: "In each city of the metropolitan class, there shall be a board of

fire and police commissioners to consist of the mayor, who shall be *ex officio* chairman of the board, and four electors of the city who shall be elected by the qualified electors of the city by a plurality of votes at the city election provided for in this act on the first Tuesday in May, 1909, and every three years thereafter."

It is provided in section 61: "The board of fire and police commissioners shall have the power and it shall be the duty of said board to appoint a chief of police, and such other officers and policemen * * * as may be necessary for the proper protection and efficient policing of the city, and as may be necessary to protect citizens and property, and maintain peace and good order."

Section 62 of the same act provides that no member or officer of the police or fire department shall be discharged for political reasons, and also provides that before such policeman or fireman can be discharged charges must be filed against him before the board of fire and police commissioners, and a hearing had, and that he shall be given an opportunity to defend himself.

Section 67 of the same act provides: "The chief of police shall have the supervision and control of the police force of the city, subject to the orders of the mayor and board of fire and police commissioners."

Section 69 provides: "He shall be subject to the orders of the mayor in the suppression of riot and tumultuous disturbances and breaches of the peace."

It will be seen that the chief of police is appointed by the mayor and the board of fire and police commissioners. He is put under their direction and control by the statute.

Sections 91, 92 and 93 provide for the trial of any city officer and his discharge because of malfeasance in office. It will therefore be seen that there is jurisdiction to try the respondent before the board which appointed him or before a judge of the district court. For these reasons, there was no necessity of this trial in this court.

The mayor and board of fire and police commissioners had power to remove him if he refused to do their bidding.

To him their power meant official life or official death. With the chief of police his obedience to the mayor and the board of fire and police commissioners was a matter of self-preservation. They had power to discharge him at once, and the governor was absolutely without power to protect him. (1) It was a matter of duty to his superiors. (2) If he went contrary to the orders of his superiors they would at once put him out of office and put another in his place. That meant disgrace and dishonor. (3) It is not shown that he saw this misdemeanor contained in the complaint committed, or that he refused to file a complaint in any particular case charging a violation of the law. (4) Nor is it shown that his superiors at any time requested him to file a complaint which he refused to file.

It is my contention: (1) That *quo warranto* is not adapted to the trial of the right to hold an office where the person in possession has been unquestionably appointed or elected in a case where an office has been created and the appointing or electing power has the lawful right to appoint or elect. My contention is that *quo warranto* is not adapted to the trial of a case which is attempted to be made criminal in its nature.

If my contention has been properly overruled, and it is still held that *quo warranto* furnishes the proper remedy to try a case which is criminal in its nature, then I say that the rules to be followed throughout are the rules which apply in a criminal case, and the respondent cannot be found guilty unless it appears by the rules, as they would be ordinarily applied in a criminal case, that he wilfully, that is, without reason or justification, refused to comply with the order of the governor and to prosecute these cases.

(2) Donahue cannot be guilty of a wilful disregard of the order made by the governor, if he obeyed the orders of his immediate superiors, because they are directly in authority over him under the provisions of the statute. His immediate superiors were the mayor and the board

of fire and police commissioners. If this be not true, then there is no such thing as discipline.

While the remedy of *quo warranto* may be used to try title to an office, it may well be doubted whether it can be used to punish one who has committed some act alleged to be forbidden by law, and by reason of which his removal from office is sought to be accomplished. The machinery to try title to an office is not adapted to trying one who is found holding an office to which he has unquestionably been appointed or elected and whose term has not yet expired.

It must be admitted that the offense charged is highly penal in its nature for the reason that the punishment sought to be inflicted is of the severest character—loss of office, loss of honor accompanied by disgrace, denial of preferment and incidentally loss of pension earned by the long continued pursuit of a career in which there was the perpetual menace of injury and death by criminals and vicious persons. While the respondent may have found himself unable by himself to punish all the violators of law to be found in the metropolis of the state, it is seemingly undeniable that for the long period of nearly 20 years he faithfully and vigilantly devoted himself to the protection of the better class of peace-loving citizens of Omaha, and guarded them against theft, arson, violence and murder as best he could.

He is entitled in any event to a trial according to the forms of the law guaranteed by the constitution and the criminal code. I do not think that punishment almost, or quite, as severe as if he were to be sent to the penitentiary should be inflicted by a form or method of trial intended merely to determine the title of office as between contestants for official position, or to oust one who had never been qualified to enter upon an office wrongfully usurped and held. I do not think this court should be a court of original jurisdiction to hear and determine cases which are in their nature criminal. I am especially opposed to the trial of a case which is practically a criminal

case by a referee. I think that this court is clearly without jurisdiction to hear and determine the case presented, and to this extent I dissent from the majority opinion.

If it shall be held that there is a right to·proceed in this case by *quo warranto,* then the rules established by the code of civil procedure are not applicable, because pleadings in such cases are still governed by the common law practice prevailing at the adoption of the code. *State v. McDaniel,* 22 Ohio St. 354. So in Illinois, where common law pleading is still in use, the rule is, that the same certainty is required in the information in the nature of *quo warranto* as in an indictment. *Lavalle v. People,* 68 Ill. 252; *Distilling & Cattle Feeding Co. v. People,* 156 Ill. 448.

In New Jersey the same view is taken as in Ohio, it being held that the statutes to facilitate pleadings in civil cases do not apply. *State v. Roe,* 26 N. J. Law, 215.

"In England the writ of *quo warranto* has long since gone out of use, and an information in the nature of *quo warranto* at the suit of the attorney general has taken its place." 2 Spelling, Injunctions and Other Extraordinary Remedies (2d ed.) sec. 1766.

While I dissent as to the jurisdiction of the court, I agree with the majority opinion that the case as alleged is not proved.